UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:                                                    Chapter 11

RAMP CHEVROLET, INC.,                                     Case no. 09-77513 (reg)

                                    Debtor.

--------------------------------------------------------x

## MEMORANDUM DECISION

Before the Court is a motion ("Motion") by Ramp Chevrolet, Inc. (the "Debtor") to hold

General Motors LLC ("GM") in contempt for willfully violating the automatic stay by asserting

improper setoffs without Bankruptcy Court approval, and compelling GM to remit to the Debtor

the sum of $975,459.80. The Debtor asserts that this amount is currently due and owing pursuant

to agreements between the parties. The Debtor also seeks to hold GM in contempt for filing a

secured proof of claim in the Debtor's case in violation of the automatic stay and to reclassify

and reduce the secured claim filed by GM from $699,096.01 to an unsecured claim in the

amount of $406,571.38.   GM, which purchased the assets and assumed certain of the prior

agreements of General Motors Corp. et al. ("Old GM" or the "GM Debtors"), in a Chapter 11

bankruptcy proceeding filed by Old GM, currently pending in the Bankruptcy Court for the

Southern District of New York, opposes the Motion.  GM denies that it violated the automatic

stay and asserts that it owes the Debtor approximately $279,000.00, not $975,459.80 pursuant to

the agreements entered into between the parties that were assigned from Old GM to GM, and

which the Debtor assumed in the case before this Court. GM argues that because the Debtor has assumed these agreements *cum onere*, GM has the right under the agreements to fix the amount that is due to the Debtor. Therefore GM has not violated the automatic stay nor is it attempting to setoff any prior obligation of the Debtor but rather it is merely exercising its rights  under the agreements.  GM also argues that no money is currently due and owing since it has the right to withhold final payment until the Debtor has complied with the conditions precedent set forth in the agreements, conditions it argues that remain unsatisfied.  For the reasons set forth below, the Motion is denied, but a hearing shall be scheduled, if required, to determine whether GM is statutorily time-barred from asserting certain charge backs.

### *Facts*

Prepetition, the Debtor operated three auto franchises (Chevrolet, Chevrolet Medium Duty Truck and Hummer).  The Debtor had entered into General Motors Dealer Sales and Service Agreements ("Dealer Agreements") with Old GM for each of the dealerships.[1]  Pursuant to the Dealer Agreements, and the practices and procedures between Old GM and the Debtor, and thereafter GM and the Debtor, the financial relationship between GM and the Debtors is memorialized in the Debtor's Open Account ("Open Account").   The Open Account is a real-time accounting of debits and credits between the parties and is reconciled on a weekly basis. If there is a credit balance, such credit balance is paid by GM to the Debtor, and if there is a debit balance, such debit balance is to be tendered by the Debtor to GM.  Pursuant to the Dealer Agreements, "all monies or accounts due [Debtor] are net of [Debtor's] indebtedness to General Motors and its subsidiaries."   On June 1, 2009, Old GM filed a voluntary petition for relief

---

[1]Each Dealer Agreement was assumed by GM in the Old GM Bankruptcy proceeding.

under Chapter 11 of the Bankruptcy Code.

On July 5, 2009, the Old GM Bankruptcy Court entered an Order (i) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury - Sponsored Purchaser; (ii) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (iii) Granting Related Relief (the "363 Sale Order").  Pursuant to the 363 Sale Order, the Old GM Bankruptcy Court authorized and approved that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "MSPA"), by and among the GM Debtors and its subsidiaries, and GM's predecessors in interest. On July 10, 2009, pursuant to the MSPA and the 363 Sale Order, GM purchased substantially all of the assets of the GM Debtors free and clear of the GM Debtors' liabilities, except as expressly assumed by GM under the MSPA.

As part of the transactions approved in the 363 Sale Order, the GM Debtors entered into and assigned to GM certain Wind-Down and other Deferred Termination Agreements ("Wind-Down Agreements" or "WDAs") dated as of June 1, 2009, between the GM Debtors and certain of their dealers, including the Debtor.  The GM Debtors offered the WDAs to the dealers as an alternative to outright rejection of the  Dealer Agreements under section 365 of the Bankruptcy Code.  The WDAs provided, among other things, that the Dealer Agreements would terminate no later than October 31, 2010, but either party could terminate the Dealer Agreement after December 31, 2009 and before October 31, 2010, upon 30 days' written notice.  The Debtor executed a WDA for each of its three dealerships and each of the WDAs were assumed by GM.[2]

---

[2]The Debtor and Old GM entered into a Final Wind-Down Agreement Replacing Participation Agreement for the Chevrolet dealership, a Deferred Termination Agreement for the Hummer dealership and a Wind-Down Agreement for the Medium Duty Truck dealership.

The Old GM Bankruptcy Court approved the WDAs and found in the 363 Sale Order that these agreements "represent[ed] valid and binding contracts, enforceable in accordance with their terms." The Old GM Bankruptcy Court retained exclusive jurisdiction to enforce and implement those agreements pursuant to paragraph 71 of the 363 Sale Order.

Under the WDAs, in consideration of the Debtor's covenants, releases and waivers and the Debtor's transfer to Old GM or GM of a non-exclusive right to use its customer lists and service records, GM agreed to pay to the Debtor a "Termination Payment Amount" or "Wind-Down Payment Amount" (collectively, the "Wind-Down Payment Amount"). The Wind-Down Payment Amounts for the Ramp Chevrolet dealership, the Chevrolet Medium Duty Truck dealership and the Hummer dealership are $1,261,613.00, $19,000.00 and $24,000.00, respectively. Thus the total potential "Wind-Down Payment Amount" to be paid to the Debtor is $1,304,613. However, the WDAs each specify that the Wind-Down Payment Amount is "subject to the terms" of the WDAs.

The WDAs provide for payment of the Wind-Down Payment Amount in two installments. The first installment equal to  25% of the total Wind-Down Payment Amount was to be paid to the Debtor upon the Debtor's execution of the WDAs and the entry of the 363 Sale Order. According to the terms of the WDAs, the first installment was to be credited to the Debtor's Open Account maintained by Old GM in accordance with the parties' standard practices. The first installment, in the amount of $326,153.25 in the aggregate, was posted to the Debtor's Open Account prior to the date the Debtor filed for bankruptcy. This credit was reflected on the July 24, 2009 Open Account Statement.

The remaining aggregate payment of 75% (potentially $978,459.80) (the "Final

Payment") is to be paid by GM to the Debtor upon the Debtor's satisfaction of certain terms and conditions specified in the WDAs.  These terms and conditions include, *inter alia*: the Debtor must deliver to GM a certificate from any applicable taxing authority that the Debtor has paid all sales, use and other taxes or provide other evidence reasonably satisfactory to GM that it will have no liability or obligation to pay any such taxes that remain unpaid; and all of the Debtor's new motor vehicle inventory must be sold.

In addition to requiring that the Wind-Down Payment Amount be made into the Debtor's Open Account, paragraph 4(c) of the WDA for the Hummer dealership and paragraph 3(c) of the WDAs for the Chevrolet dealership and the Medium Duty Truck dealerships each provide:

> In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the [Wind Down Payment Amount] may, in [Old]GM's or [GM's] reasonable discretion, be (i) reduced by any amount owed by [Debtor] to [Old]GM, [to GM] or their Affiliates [as defined below], and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of [Debtor] relating to the Subject Dealership Operations including, but not limited to; all or any part of the [Wind Down Payment Amount] (each, a "Competing Claim"), in which event [Old]GM or [GM], as applicable, may delay payment of all or any part of the Termination Payment Amount until [Old]GM or [GM], as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

(collectively, the "Termination Payment Procedures").

"Affiliate" is defined in the WDAs as "any Person that controls is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses."  "Person" is defined in the WDAs as "an individual, partnership, limited liability company, association, corporation or other entity."

Pursuant to paragraph 6(a) of the WDA for the

Hummer dealership and paragraphs 5(a) of the WDAs for the Chevrolet and Medium Duty Truck

dealerships, the Debtor:

> releases, settles, cancels, discharges, and acknowledges to be fully satisfied any
> and all claims, demands, damages, debts, liabilities, obligations, costs, expenses,
> liens, actions, and causes of action of every kind and nature whatsoever . . .
> whether known or unknown, foreseen or unforeseen, suspected or unsuspected
> ("Claims"), which [Debtor] or anyone claiming through or under [Debtor] may
> have as of the date of the execution of this Agreement against [Old]GM,  [GM],
> their Affiliates or any of their respective members, partners, venturers,
> stockholders, officers, directors, employees, agents, spouses, legal
> representatives, successors or assigns (collectively, the "GM Parties"), arising out
> of or relating to . . . the Dealer Agreement or this Agreement, . . . Standards for
> Excellence ("SFE") related payments or bonuses . . . and any representations
> regarding motor vehicle sales or profits associated with Dealership Operations
> under the Dealer Agreements, or . . . any other events, transactions, claims,
> discussions or circumstances of any kind arising in whole or in part prior to the
> effective date of this Agreement, provided, however, that the foregoing release
> shall not extend to (x) reimbursement to [Debtor] of unpaid warranty claims if the
> transactions giving rise to such claims occurred within ninety (90) days of the
> date of this Agreement, (y) the payment to [Debtor] of any incentives currently
> owing to [Debtor] or any in its Open Account, or (z) any claims of [Debtor]
> pursuant to 17.4 of the Dealer Agreement, all of which amounts described in (x) -
> (z) above of this sentence shall be subject to setoff by [Old]GM or [GM], as
> applicable, of any amounts due or to become due to either or any of its Affiliates.

(collectively, the "Releases").

By letter dated September 23, 2009, the Debtor requested early termination of its Dealer

Agreements and that GM initiate the wind-down process for each of the dealerships.   At or

about the same time, the Debtor had failed to remit sales tax owed to the New York State

Department of Tax and Finance ("DTF"), and DTF has asserted a claim against the Debtor in the

aggregate amount in excess of $2.5 million (the "DTF Claim").  Of this amount, the sum of

$2,082,386.13 is subject to tax warrants.  On October 2, 2009, DTF sought to enforce its rights

under the tax warrants and changed the locks on the dealership.   On October 5, 2009 (the

"Petition Date"), Ramp filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* By letter dated October 14, 2009, GM notified the Debtor that certain of the conditions precedent set forth in the WDAs needed to be satisfied before the Debtor was eligible to receive the Final Payment. One of the conditions specified by GM is that the Debtor must provide a release in favor of GM executed by DTF. During November, 2009, the Debtor sold the last of its retail vehicles.

On December 3, 2009, the Debtor filed a motion to assume the WDAs ("Assumption Motion"). The Assumption Motion was served on the U.S. Trustee, GM and other creditors and parties in interest. The Debtor represented in the Assumption Motion that termination of the franchises would be beneficial to the Debtor's estate, and the Debtor would remit a portion of the Termination Payment Amount to pay down the secured portion of the DTF Claim. A hearing was held and the Assumption Motion was granted without opposition. On February 3, 2010, an order was entered granting the Assumption Motion ("Assumption Order"). In the Assumption Order, the Court directed GM to remit the Final Payment to the Debtor "pursuant to the terms of the Wind-Down Agreement." The Assumption Order as submitted to the Court and as entered does not address the amount due by GM to the Debtor under the WDAs.

On July 23, 2010, GM filed a proof of claim stating it has a secured claim in the amount of $669,096.01 ("GM Proof of Claim"). According to the attachments to the GM Proof of Claim, GM is asserting a secured claim based on its setoff and recoupment rights under the WDAs. GM also refers to the Termination Payment Procedures in each of the WDAs, which confers upon GM the right to reduce the Termination Payment Amount in addition to any rights of setoff under the Dealer Agreements. Attached as Exhibit D to the GM Proof of Claim is a

summary of the weekly Open Account statements provided to the Debtor which show the amounts due and owing to GM.  Pursuant to the Open Account statement dated as of July 16, 2010, the Debtor owes to GM a total of $699,096.01.  This amount is primarily made up of three major charges.  The first two charges in the amount of $225,000 each relate to Open Account charges for the unpaid rent owed by the Debtor's principal to an affiliate of GM for the months of May through September, 2009 ("Rent Claim").[3]  The third major item relates to a $292,524.63 charge back based on an audit completed by GM in May 2009.  A charge back results when GM determines that a dealer receives warranty reimbursements, sales incentives or other payments which GM later determines the dealer is not entitled to receive. According to GM, the Debtor improperly requested and received incentive payments and Old GM notified Debtor of the audit results in May 2009 and again in June 2009.  A total of $271,000 of the charge back amount relates to the Debtor's disqualification for certain Standards for Excellence ("SFE") payments it had claimed and received.  GM alleges that the Debtor fraudulently manipulated the customer survey process so that dealership employees, not actual retail customers, filled out the surveys.

While this matter was before the Court and without providing this Court any notice, GM filed a motion in the Old GM bankruptcy case to enforce the WDAs executed by the Debtor,

---

[3]There is a prime lease/sublease arrangement with GM's subsidiary Argonaut Holdings, Inc. ("AHI").  AHI leased two parcels of property from Mr. Rampone, the Debtor's principal, and pursuant to those leases AHI paid Mr. Rampone $45,000 per month.  There was then a sublease by AHI to the Debtor which obligated the Debtor to pay AHI the same $45,000 per month.  Although GM paid Rampone, the Debtor did not make the required payments to AHI on the two subleases for the rent due for May through September 2009.  The AHI unpaid rent charges were posted to the Debtor's Open Account, which posting is authorized under § 13.2(I) of the Debtor's leases with AHI.

asserting that any issues regarding the enforceability of the WDAs came within the exclusive jurisdiction of the Old GM Bankruptcy Court. On November 18, 2010, Judge Gerber ruled that the Old GM Bankruptcy Court did in fact have exclusive jurisdiction over this matter under applicable law and under the Sale Order, the MSPA and the WDAs. He also made clear that the Debtor should have first sought relief in the Old GM bankruptcy case, not in its own case. Judge Gerber ruled, however, based on the specific facts of this case that permissive abstention pursuant to 28 U.S.C. § 1334(c)(1) was appropriate, and therefore the Motion remains before this Court to resolve.

Since the entry of the Assumption Order, the Debtor has filed a Disclosure Statement and Plan, as amended. Based on the terms of the Plan, the Debtor intends to use the proceeds from the Final Payment to pay down the DTF secured claim, with a carve-out allocated for administration expenses and for payment of a portion of the unsecured claims under the Debtor's plan. GM has filed an objection to the Disclosure Statement, claiming that it fails to adequately disclose the Debtor's obligations under the WDAs, which will significantly reduce the amount available for distribution under the Plan as proposed.

### *Positions of the Parties*

The Debtor asserts that GM violated the automatic stay by applying amounts owed by the Debtor pre-petition in the Open Account in the amount of $699,096.01 to reduce the Final Payment from $978,459.80 to the approximate amount of $279,000.00, and by failing to seek Bankruptcy Court approval prior to effectuating any alleged setoff. According to the Debtor, GM may not use setoff to reduce the Final Payment because the setoff amount represents a post-petition obligation, and the obligations described in GM's proof of claim all arose prepetition.

Unless both obligations arose prepetition, GM has no right to setoff any amount against the Final

Payment under Bankruptcy Code § 553. The Debtor also argues that GM may not setoff the

portion of its claim attributable to the Rent Claim because the rent is actually an obligation of a

non-debtor third party, and not an obligation of the Debtor to GM. Under Bankruptcy Code §

553, GM may not reduce what it owes to the Debtor by an amount a third party owes to GM,

even if such rights are memorialized in a valid, binding contract. For the same reasons, Debtor

seeks to reclassify the GM Proof of Claim from a secured claim to a general unsecured claim.

Finally, the Debtor asserts that GM's claim should be reduced from $699,096.01 to

$406,571.38 because GM is not entitled to any of the charge backs in the aggregate amount of

$292,524.63. According to the Debtor, the New York Franchised Motor Vehicle Dealer Act (the

"Act"), N.Y. Veh. & Traf. Law §§ 461 *et seq*. precludes GM from taking a charge back on any

warranty or sales incentive payment more than one year after the date the franchisor made the

payment to the dealer. See the Act, § 463(2)(z).[4] The Debtor alleges that all of the charge backs

are prohibited by the Act because they were posted more than one year after the credits were

initially posted in the Open Account.[5]

---

[4]Section 463(2)(z) of the Act states in pertinent part:
No franchisor shall conduct a warranty audit or charge back or otherwise hold a
franchised motor vehicle dealer liable for charges more than one year after the
date the franchisor paid such dealer for the performance of the warranty service.
No franchisor shall charge back or otherwise hold a franchised motor vehicle
dealer liable for sales incentives or charges related to a new motor vehicle more
than eighteen months after the franchisor has paid such sales incentives. Provided,
however, the time frames in this paragraph shall not apply in the instance of
fraud.

[5]GM has agreed to reduce the GM Proof of Claim by $3,500.00 based on its calculation
that this portion was posted outside the time frames proscribed by the Act. This charge back is
not related to the SFE charge backs, but relates to credits previously given for sales incentives.

GM opposes the relief requested in the Motion, and asserts that it did not violate the automatic stay by posting debits in the Open Account or reducing the amount of the Final Payment pursuant to the terms of the WDAs, or by filing the GM Proof of Claim.  GM  argues that the Debtor was aware of the Rent Claim and the charge backs at the time the WDAs were assumed by Old GM and assigned to GM, and at the time the Debtor filed the Assumption Motion.  The Debtor is now bound by the terms of the WDAs which permit GM to reduce, at its discretion, the amount of the Final Payment by any amounts due by the Debtor to GM or its affiliates.  Any challenge by the Debtor to these reductions is barred by the Releases in each of the WDAs.  Under the WDAs, the reduced amount is the actual Final Payment, and GM is contractually obligated only to pay to the Debtor the reduced amount of approximately $279,000. GM argues that it is entitled to calculate the Final Payment by utilizing the netting provisions in the Dealer Agreements and the WDAs.  In the alternative, GM asserts it has valid setoff and/or recoupment rights, which exist despite the fact that the Debtor is in bankruptcy.   GM also asserts that it has properly calculated the amount of the charge backs and because the SFE credits were based on fraudulent conduct of the Debtor, the time restrictions for assessing charge backs do not apply.  Finally, GM claims that the Debtor has not complied with the conditions precedent set forth in the WDAs and is not currently entitled to any of the Final Payment, because DTF recently asserted claims against GM for the Debtor's tax indebtedness in a separate proceeding.

## *Discussion*

The Debtor couches the Motion as an attempt to redress the wrongs it has suffered at the

---

By agreeing to do so, GM appears to acknowledge that it does not intend to violate the Act, regardless of the Debtor's Releases set forth in the WDAs.

hands of GM.  The Debtor seeks rulings regarding (1) whether GM's acts violated the automatic

stay, (2) whether the GM Proof of Claim should be reclassified and/or reduced and (3) whether

GM should be compelled to turn over to the Debtor $978,459.80.  For the reasons set forth herein,

all three requests must be denied.

The Debtor articulates two theories in support of its Motion to compel GM to turn over

$978,459.80 to the Debtor.  The first theory is based on the premise that any attempt by GM to

reduce this amount by the Rent Claim violates the automatic stay, and constitutes a setoff which

is not permitted because it does not comply with the requirements set forth in Bankruptcy Code §

553.  The second argument is based on the Debtor's assertion that GM is prohibited by the Act

from utilizing the charge backs as a basis for reducing the Final Payment. The Debtor seemingly

believes that once the Court rules that GM cannot reduce the Final Payment by the amount of the

Rent Claim or the charge backs, the path is cleared for entry of an order  compelling GM to turn

over the entire amount sought by the Debtor.[6]  Under this scenario, GM would be left with an

unsecured claim only for the amount of the Rent Claim and with no claim for the charge backs

which the Debtor alleges were taken in violation of the Act.

### 1. Applicable Law

To the extent the Debtor challenges actions taken by GM pursuant to the WDAs, the Court

is mindful of the requirements imposed upon the Debtor once it assumed the WDAs.  Upon

assumption of an executory contract pursuant to Bankruptcy Code § 365, the debtor is bound to

---

[6]Because the Debtor is seeking to compel GM to turnover property of the Debtor's estate, the Debtor was required to bring this portion of the Motion by adversary proceeding pursuant to Fed.R. Bankr.P. 7001(1).  However, given the extensive briefing by the parties and the oral argument held before this Court, the Court will not deny the Debtor's request on procedural grounds.

assume all of its terms *cum onere.  NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 531-32 (1984). As a result, a debtor "cannot simply retain the favorable and excise the burdensome provisions of an agreement." *In re Kopel*, 232 B.R. 57, 63-64 (Bankr. E.D.N.Y. 1999).  *See also In re Village Rathskeller*, 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992) (The debtor does not have the right to retain the favorable provisions of a contract and reject the unfavorable ones).   However, certain contractual provisions which are expressly deemed unenforceable by the Bankruptcy Code, or provisions which are clearly designed to circumvent provisions of the Bankruptcy Code, may be unenforceable despite assumption. *Id; In re Kopel,* 232 B.R. at 64.   Such examples include Bankruptcy Code § 365(e)(1), which makes *ipso facto* clauses unenforceable and Bankruptcy Code § 365(f)(1), which makes certain contractual clauses restricting assignment unenforceable. *In re Village Rathskeller,* 147 B.R. at 671-72.  With respect to contract provisions which are alleged to be unenforceable because they are designed to circumvent provisions of the Bankruptcy Code, courts have imposed the further requirements that there be "no substantial economic detriment to the [non-debtor counterparty]", and that enforcement of the provision would "preclude the bankruptcy estate from realizing the intrinsic value of its assets." *Id.* At 672.


In analyzing this issue the Court where appropriate must look to relevant sate law. In this case the law of Michigan applies to each of the WDAs.[7]  Under Michigan law the following is the standard for contract interpretation:

A court's obligation in interpreting a written contract is to discern the contracting

---

[7]The choice of law provision in a contract governs which law applies. *Westinghouse Credit Corp.v. D'Urso*, 278 F3d 138, 146 (2d Cir. 2002).  Each of the WDAs specify that they are to be construed in accordance with Michigan law.

parties' intent. *Quality Products and Concepts Co. v. Nagel Precision, Inc*., 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (*citing Sobczak v. Kotwicki*, 347 Mich. 242, 249, 79 N.W.2d 471 (1956)). This intent is to be determined from a reading of the instrument as a whole in light of the surrounding circumstances. *Cleveland v. Detroit Trust Co.*, 264 Mich. 253, 257, 249 N.W. 842 (1933). If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy. *Quality Products,* 469 Mich. at 375*, 666 N.W.2d 251 (citing   Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel*, 460 Mich. 558, 570, *596 N.W.2d 915 (1999)); Port Huron Ed. Ass'n v. Port Huron Area School Dist*., 452 Mich. 309, 323, 550 N.W.2d 228 (1996) (citing *Dykema v. Muskegon Piston Ring Co.*, 348 Mich. 129, 138, 82 N.W.2d 467 (1957)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided."
*UAW-GM Human Resource Center v. KSL Recreation Corp*., 228 Mich.App. 486, 491-492, 579 N.W.2d 411, 422 (1998) (*quoting Dillon v. DeNooyer Chevrolet Geo*, 217 Mich.App. 163, 166, 550 N.W.2d 846 (1996)).

*In re Big Buck Brewery & Steakhouse, Inc*., 399 B.R. 820, 824-25 (Bankr. E.D. Mich. 2009).

Keeping these two constructs in mind, the Court must determine whether GM's actions violated the automatic stay, and whether GM should be compelled to turn over to the Debtor $978,459.80 or some lesser amount.

## 2. Whether GM's Reduction of the Final Payment Violates the Automatic Stay

According to the Debtor, GM's act of reducing the  $978,459.80 by the Rent Claim and the charge backs  violated Bankruptcy Code § 362(a)(7), which stays the exercise of any contractual right to setoff or "net out" any payment amount arising or in connection with one or more agreements.  As the Supreme Court recognized in *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 288 (1995), any right of setoff an entity may have against a debtor under applicable state law is preserved by Bankruptcy Code § 553, with certain exceptions set forth therein.  While such setoff rights are preserved under the Bankruptcy Code, a party may not

exercise such rights unless the party complies with the additional requirements imposed by the Bankruptcy Code,[8] and the stay is vacated by the Bankruptcy Court.  Therefore, in order to determine whether GM violated the stay, the Court must examine GM's acts in the context of rights and obligations conferred upon the parties under the WDAs.  The Court concludes that GM's act of reducing the amount to be paid by GM complies with the terms of the WDAs, and does  not constitute a setoff.

The Debtor assumes that GM has an obligation to pay the Debtor $978,459.80 under the WDAs as the fixed Final Payment.  If the WDAs fix the Final Payment at $978,459.80, and require GM to post this amount into the Open Account subject to reductions based on debits posted in the Open Account, the Debtor would at least have a colorable argument that GM is seeking to engage in some form of setoff.   However, the WDAs do not require GM  to post the entire $978,459.80 in the Open Account, with a crediting and debiting to follow.  The Termination Payment Procedures give GM the right, in addition to any setoff rights under the Open Account arrangement, to reduce the Termination Payment Amount (the entire amount owed under the WDAs) by any amount owed by the Debtor to Old GM, GM or their "Affiliates."  This is not a true setoff right because GM is not setting off what it owes under the WDAs with amounts it claims it is owed by the Debtor under a different transaction.  Rather, GM was granted an additional right under the WDAs to fix the Termination Payment Amount.  The difference is not a technical one, because it confers upon GM the sole discretionary right to fix the amount

---

[8]Bankruptcy Code § 553 recognizes the right of setoff in bankruptcy so long as the debts are mutual (ie. involving the same parties) and they are prepetition debts. *See Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 738-39 (Bankr. S.D.N.Y. 1995).

actually owing under the WDAs.   Because this is not a true setoff, GM's calculations do not

violate the stay, and GM is not required to satisfy the terms of Bankruptcy Code § 553 in order to

take the reduction.  It is clear from the WDAs that GM has a contractual right to fix the Wind-

Down Payment Amount, which right is  separate and apart from any  setoff rights GM may or

may not have. Based on the Debtor's assumption of the WDAs, the Debtor may not now

challenge GM's right to employ a process granted to it under the WDAs.

       Even if the Termination Payment Amount language is deemed to confer only a setoff or

netting right, there is no reason to find that this right should not be enforceable against the Debtor.

Courts have found similar provisions enforceable post-assumption.  *See In re Monroeville Dodge,*

*Ltd.,* 166 B.R. 264, 267-68 (Bankr. W.D. Pa. 1994) (Debtor assumed its auto dealer agreement

*cum onere* and pursuant to the agreement's netting provision, the manufacturer was permitted to

withhold post-petition credits owing to the debtor in order to recover prepetition overpayments

without violating the automatic stay or Bankruptcy Code § 553); and *U.S. v. Gerth,* 991 F.2d

1428, 1431-32 (8th Cir. 1993) (Debtor's assumption of the contract did not convert the debtor's

right to receive payments subject to preconditions into a post-petition obligation in violation of

Bankruptcy Code § 553).  There is also no basis to refuse to enforce the rights GM has against the

Debtor under the WDAs, whether it is a setoff or netting arrangement, or a right to fix the Final

Payment, on equitable grounds.   The parties bargained for a method to wind down the franchises,

to allow the Debtor and other dealers to receive value for their franchises, and to have GM to

make a one time payment in satisfaction of any claims the Debtor and other dealers may have

against GM.  Applying the terms of the WDAs as they are written is hardly inequitable as it

merely allows the parties to the WDAs to receive the benefit of their respective bargains.

### 3. GM's Right to Assert Charge Backs

The Debtor also challenges the amount of GM's charge backs on the grounds that the Act, which applies to the Debtor and GM, bars GM from asserting charge backs more than one year after the credits were initially granted. Putting aside the issue of whether the Releases in each of the WDAs preclude the Debtor from challenging the charge backs, GM asserts that the time restrictions contained in the Act do not apply to charge backs related to fraudulent claims. Because the SFE credits were based on falsely completed customer surveys, GM claims there is no time limit to these charge backs. GM has also reviewed the other charge backs and has agreed to reduce its claim by $3,500.00 based on charge backs which were taken outside the applicable time period. The Debtor denies that the SFE credits were granted based on fraudulent surveys. The Court directs the Debtor and GM to review the charge backs objected to by the Debtor based on the lack of timeliness, and in the event the parties cannot agree on the proper amount of the charge backs GM is entitled to take, which will likely turn on whether the charge backs which would otherwise be barred based on timeliness are permitted because the Debtor committed fraud, the Court shall schedule an evidentiary hearing to determine whether the charge backs in question are prohibited by the Act.

### 4. GM Proof of Claim

The Court also rejects the Debtor's contention that by filing the GM Proof of Claim, GM violated the automatic stay. The act of filing a proof of claim is not barred by the automatic stay. *See In re Surprise,* 342 B.R. 119, 121-22 (Bankr. N.D.N.Y. 2006) (The filing of a proof of claim in the appropriate Bankruptcy Court "'is the logical equivalent of a request for relief from the automatic stay, which cannot in itself constitute a violation of the stay.'") (citing *In re Sammon,*

253 B.R. 672, 681 (Bankr. D.S.C. 2000)).  In addition, the GM recites in the GM Proof of Claim

that it was filed to preserve GM's rights under the WDAs and the Dealer Agreements and to

protect itself from potential forfeiture of its rights in this case.  For these reasons, there is no basis

to find that this act by GM violated the automatic stay.

### 5. Preconditions to Receipt of Final Payment

GM also has the right under the WDAs to delay making the Final Payment in the event

GM has a "reasonable basis to believe that any party has or claims any interest in the assets or

properties of [Debtor]" relating to the dealership operations, including all or any part of the

Termination Payment Amount.  In such event, GM has the right to delay payment of all or any

part of the Termination Payment Amount until GM  has received evidence in form and substance

reasonably acceptable to it that such claims have been fully and finally resolved.  According to

GM, the DTF has asserted claims against GM for the Debtor's tax indebtedness in a tax

proceeding, and the DTF has scheduled a conciliation conference with GM.  Therefore, GM

claims that the Debtor has not provided sufficient documentation that it has paid all of its taxes,

and the tax claim represents a competing claim that allows GM to defer from making a payment

until such claim is resolved.  The Court agrees that the Debtor has not fulfilled all of the

preconditions to receipt of the Final Payment set forth in the WDAs.  Therefore, GM has no

current obligation to turn over any portion of the Final Payment under the WDAs.

### Conclusion

For the reasons set forth above, the Motion is denied in its entirety.  The WDAs, which

were assumed by the Debtor, are binding agreements and the Debtor is charged with accepting the

burdens and benefits therein.  GM's actions taken with respect to the terms of the WDAs did not

violate the automatic stay, nor did GM's act of filing the GM Proof of Claim violate the automatic stay. Under the WDAs, GM has the discretion to reduce the Termination Payment Amount. Such reduction is not a setoff, and is enforceable as a matter of law and equity. To the extent the Debtor and GM cannot agree as to whether any of the charge backs are prohibited as untimely under the Act, the Court shall hold an evidentiary hearing on February 22, 2011 at 10:00 a.m. to resolve this dispute. GM also has the right under the WDAs to enforce the pre-conditions to release of the Final Payment. Based on the claims asserted by DTF against GM, the Debtor does not have a right to any portion of the Final Payment under the terms of the WDAs.

An order consistent with the memorandum decision shall be entered.



**Dated: Central Islip, New York**
**December 21, 2010**

**Robert E. Grossman**
**United States Bankruptcy Judge**